### In re MORTGAGE GUARANTEE CO. et al.
### No. 9320.

District Court, D. Maryland.

Feb. 6, 1941.

Robert H. Winn, of Washington, D. C., for Securities and Exchange Commission.

Robert Stinson, of Baltimore, Md. (Ritchie, Janney, Ober & Williams, of Baltimore, Md. of counsel), for Trustees.

WILLIAM C. COLEMAN, District Judge.

The question presented for decision is whether the Plan of Reorganization submitted by the Trustee complies with the provisions of the statute and is fair, equitable and feasible, as the statute requires it shall be, before the court shall approve it. 11 U.S.C.A. § 621.

The court has previously rendered a comprehensive opinion dealing with the question of jurisdiction and the status of debtor-owned certificates. Suffice it here to say that the court concluded, for the reasons given in this earlier opinion, that it has jurisdiction in this proceeding over the debtor-owned mortgaged properties, and that the debtor-owned certificates in the various mortgages are entitled to share equally in the proceeds of the mortgages or the mortgaged property with the other certificates in the given mortgage and thus to inure to the benefit of the Debtor's general creditors.

As an introduction to the court's conclusion with respect to the Plan of Reorganization, it is appropriate, if not indeed essential, to give a statement of the Debtor's history and business. Accordingly, we give the following:

The Mortgage Guarantee Company, hereinafter called the Debtor, was incorporated in Delaware in 1906, and has since engaged in a general mortgage business in Baltimore, Washington and Atlantic City. It has a capital stock of 20,000 shares of the par value of $25 each. It is the owner of all of the outstanding stock of Saratoga Building & Land Corporation, which was organized in 1913 as a title holding and property management subsidiary. It also acquired in 1933 all of the stock of two other property holding subsidiaries, the Druid Apartments Company and the Wyman Park Apartments Company. Proceedings looking to the reorganization of all of these subsidiaries have been consolidated in the present proceeding. There is also an affiliated company, the Eastern Shore Company, with nominal capital held for the Debtor by its employees, it having been organized by the Debtor merely to facilitate the latter's operations in Atlantic City. Since, therefore, it has acted merely as an operating agency and its operations are accounted for through the Debtor no further proceedings were necessary to bring it within the jurisdiction of this court.

For many years the Debtor was successful. Its business consisted for the most part in making first mortgage loans on fee simple or leasehold property and selling so-called mortgage participation certificates to the public with its guarantee. In some cases it made second mortgage loans and in a few third mortgage loans, but in such cases the mortgages were sold in their entirety and not to the public generally. The first mortgage loans were sold on the basis of 50 per cent of the appraised value of the property. For some years the mortgages dealt in by the Debtor were of a conservative character. It is to be noted that the Debtor never sold bonds or other evidences of indebtedness secured in a manner which was more common, namely, by a pool of mortgages, but only mortgage participation certificates in separate mortgages. The result is that independently of other mortgages there are some 365 separate first mortgages, or the prop-

erties securing the same, and there is an average of about 26 certificate holders holding an interest in each mortgage, and the number of holders in single mortgages runs to more than a thousand.

The Debtor collapsed in 1932-33 due to two major causes, (1) the economic depression general throughout the country, and (2) the extension of the Debtor's business to mortgages of a less desirable and more speculative character, especially in Atlantic City. More than thirty per cent of the Debtor's mortgages became in default just prior to the nation-wide bank holiday. It spent more than a million dollars of its own money exhausting its capital and resources in meeting its obligations to its certificate holders and in protecting its mortgages. In October, 1932, it invoked for the first time the nine months period of grace contained in its guarantee of principal to its certificate holders. It appears that the actual default in its obligations to its certificate holders occurred on or about April 8, 1933, which was the effective date of the Debtor's 1933 Plan hereinafter frequently referred to.

The Trustee's report indicates that the Debtor might have survived the general depression had it confined itself to its original more conservative business in Baltimore and Washington instead of extending, as it did, its business to Atlantic City —due to competition from similar companies that had entered the field, and also to overconfidence in its long and successful record. It is very significant that almost half of the Debtor's present investments were made in Atlantic City and this was probably the largest factor contributing to the Debtor's collapse.

As the Trustee further points out, resort properties are the most unsubstantial of all, and the entire character of Atlantic City has changed in the past ten years, largely because it has been taken over to a very large extent by daily automobile excursions causing a radical change in the previous type of patrons frequenting that resort. There has been a loss of more than two-thirds in property values during the last ten years in Atlantic City, the total tax assessable basis having decreased from over $300,000,000 in 1929 to less than $94,-000,000 in 1939, as contrasted with Baltimore's real estate assessments in 1929 of $1,159,254,936 and in 1939 $1,068,212,138, or a decrease of only about 8 per cent. Furthermore, Atlantic City taxes were not reduced proportionately. In fact, the tax rate was increased from 2.74 in 1929 to .6.393 in 1939, with the result that Atlantic City now has the highest per capita debt (389.07, as against Baltimore's 134.-89), and the highest adjusted tax rate in the country. The total deficiency in securities for first mortgages in Atlantic City, as shown by the latest appraisal submitted to the Court is nearly $3,000,000, compared to a deficiency throughout Maryland, including Baltimore, and in Washington, of less than $600,000. Besides, there is a deficiency in second mortgages of over a million dollars.

From the aforegoing it was inevitable that in 1933 the Debtor faced either a receivership or some form of voluntary reorganization by its creditors. Accordingly, on February 14, 1933, a Plan of Readjustment, hereinafter generally referred to as the 1933 Plan, was submitted to the Debtor's certificate holders, it being largely copied from a plan that had been adopted by a Massachusetts company dealing in similar fractional mortgage certificates. Ninety per cent of the certificate holders assented to this Plan and it was declared effective April 8, 1933. Additional assents subsequently brought the total number of assents up to 95 per cent, and some of the remaining certificate holders became bound by the Plan by later accepting certificates stamped subject to the Plan.

Very briefly, the major provisions of the 1933 Plan may be summarized as follows: The Debtor was given complete control of the mortgaged premises covered by the participation certificates just as though the Debtor were the mortgagee of each mortgage with power "to manage the property so acquired and hold it in trust for the benefit of the holders of the particular mortgages in lieu of the mortgage itself", to make advances thereon, to foreclose, etc. The Debtor was given a period of grace of five years within which to meet its guarantee on the principal and one year for meeting its guarantee on interest. It was permitted to retain one per cent per annum out of interest collected in addition to the one-half per cent theretofore retained (provided that in no event any certificate holder should receive less than 4½ per cent per annum), the purpose being (1) to maintain the Debtor in a position to preserve the mortgaged premises, and (2) to give financial substance to the Debtor's guarantee. Certificate holders

990

owning the outstanding interest in any mortgage not previously foreclosed were given the right to withdraw their mortgages, and collect the same themselves upon surrender of the guarantee, and reimbursement of advances by the Debtor. The Debtor was permitted to terminate the Plan, but only after it had paid the principal in full on all outstanding mortgages and certificates which would have matured except for the Plan, and also all interest theretofore due and unpaid at the rate of 4½ per cent per annum. After the Plan was terminated the Debtor agreed to pay principal in full and also interest as due at the rate of 5½ per cent; that is to say, from and after the termination of the Plan the holders of mortgages and certificates who had assented to the Plan were after its termination to have the same rights and privileges to which they would have been entitled had the Plan never been adopted. There was the further agreement by those assenting to the Plan that such assent would be irrevocable except upon conditions which did not, in fact, ever occur.

The present management of the Debtor has, since the latter part of 1933, been under the direction and control of a group of officers who for the most part had no connection with the Debtor during the period when the mortgage loans were made and the certificates sold. Under the 1933 Plan, by September, 1939, the total outstanding mortgages had been reduced from $22,255,000 to $13,940,000, that is to say, more than one-third of the mortgages had been taken over by the certificate holders or paid or settled. While the 1933 Plan was in operation there was paid to investors interest aggregating $3,153,570.08, or in the aggregate over 65 per cent of the reduced interest on outstanding certificates was paid, or about 2.95 per cent annually instead of 4½ per cent. The reduction of interest from 5½ per cent to 4½ per cent increased the income of the Debtor and enabled it to continue to operate and temporarily to avoid receivership. However, in many cases particular properties were not, in fact, directly aided at all, and in some cases particular properties are now in a worse condition than they were before the adoption of the 1933 Plan.

Thus from the aforegoing, taken from the summary of the Trustee in his report with respect to the 1933 Plan, it is clear that this Plan was adopted before the full extent of the financial disaster was apparent. It attempted to completely rehabilitate the Debtor, and while it failed in this, due to the continued depression in real estate values, it did avoid receivership, permitted continued operation and unified management, the liquidation of one-third of the mortgages, continued payment of interest on the remaining mortgages at an average rate of about 3 per cent annually, and from time to time provided aid through advances to many of the remaining properties. We quote the following very significant statement from the Trustee's report: "Why did holders of Certificates in good mortgages assent to a plan under which they contributed to the preservation of the bad? No doubt one of the reasons was because no one in 1933 knew which properties would need assistance. Moreover, often such Certificate Holders had an interest in *several* properties, at least some of which would probably need assistance. This is shown by the fact that there were about 4250 Certificate Holders in April 1933, compared with 3848 Certificate Holders today, though more than one-third of the mortgages have been paid off or otherwise settled. (Had the Certificate Holders been reduced proportionately—one-third—the number would have been reduced by about 1400 instead of by about 400.) The average investor is still interested in between two and three mortgages. Another reason for the willingness to reduce the interest rate was the general reduction in investment income which took place in other securities. But, of course, the predominant reason was that during the early months of 1933 most investors were frightened and ready to join in creditors' agreements, rather than have properties foreclosed and thrown on the market at a time when even good properties could not be sold. The 1933 expectation that real estate values would soon return has not, unfortunately, been realized."

In 1937 came the so-called voluntary plan of realization under which all certificate holders were asked to deposit their certificates under a deposit agreement with a committee. In the prospectus sent to the certificate holders it was stated that though the Debtor had made substantial progress in the liquidation of its securities much remained to be done, that a considerable

period of time would be required to complete an orderly liquidation, that a partial liquidating distribution in cash to be raised by loan would be desirable meanwhile, and further that during the period of liquidation efficient servicing of mortgages and properties and a consistent policy of prudent realization could best be obtained through unified management and control.

This 1937 Plan, which was the subject of amendments in the following year, provided briefly for two options:—Option A, whereby certificate holders were to receive cash and new securities in exchange for their old ones, the amount of cash and the amount and class of new securities being determined by the classification of the mortgage in which the old certificates were held, and the cash was to be provided by a loan from the Reconstruction Finance Corporation secured by the old mortgage certificates surrendered; and Option B, whereby certificate holders were given the alternative of obtaining a new certificate participation in the same mortgage or a mortgage of substantially equivalent value, and the Debtor was to be released from any liability on its guaranty with respect to such certificates.

Under Option A, the Debtor properties were to be directly and under Option B, indirectly managed by the Debtor, with the right under Option B after two years to remove the Debtor as manager by the vote of two-thirds of the principal amount of outstanding certificate holders.

In spite of the fact that more than eighty per cent of the outstanding certificate holders assented to this 1937 Plan, it ultimately failed because unanimous consent appeared to be impossible, with the result that the present proceedings were instituted on September 21, 1939.

At the direction of the court, complete and thorough audits have been made by a well-known, competent and totally disinterested firm of certified public accountants. Likewise, the appraisals of the properties have been brought down to date by appraisers selected by the Trustee with particular relation to their competency with respect to the different types of properties. We, therefore, now have reliable figures from which may be ascertained a reasonably accurate picture of the Debtor's status which the Trustee has summarized as follows:

### Assets.

| | |
|---|---|
| Free Assets (Note 1) | $ 61,000.00 |
| Debit Balances (i. e. advances to individual properties—Section I and Schedule 5 of Section II of the audit) | 84,500.00 |
| Excess appraisal over mortgages on Company owned property of face value of $147,332.97, assigned a recoverable value for reasons set forth in Note 2 | 70,000.00 |
| Excess value of sales contracts over certificates issued | 6,500.00 |
| Debtor owned certificates of uncertain legal status and value (see Note 3) | 213,000.00 |
| | $ 435,000.00 |

### Liabilities.

| | |
|---|---|
| Deficiency in principal, first and second mortgages, including arrears in taxes, after application of credit balances. (See Appendix No. 1) | $4,405,000.00 |
| Accrued interest on mortgages (see Schedule attached to Section II of audit, Note 4 below) | 2,005,000.00 |
| Deficiency, notes payable | 294,000.00 |
| Sundry Liabilities | 89,000.00 |
| | $6,793,000.00 |
| Approximate Deficit | $6,358,000.00 |

It will thus be seen that the total deficiency claims in principal and interest of all mortgages may be approximately six and a half million dollars. The administrative features necessarily incident to any reorganization plan worthy of consideration involve the work of collecting annually some $200,000 in interest from outside mortgagors, the managing and operating of approximately five hundred properties (some of the 365 mortgages cover several properties), with about 1,800 rental units from which are collected about $900,000 in rents, supervising the management of hotels having a gross income of around $600,000, furnishing certificates to some 3,850 investors including the distribution of income, etc.

The outlook for the certificate holders is obviously dark. Any prognosis is at best based upon a high degree of speculation. We quote the following from the Report of the Trustee:

"Giving effect to the reductions by payment, composition and withdrawal of about $8,000,000 in *principal* amount of mortgages outstanding on April 8, 1933, the per-

centage loss in the *total* outstanding as of April 1933 is estimated at 19%, in *principal*. The percentage loss to be expected in the $12,869,000 of first mortgages still remaining—since these include the worst mortgages—will be higher; an average loss of 31% is indicated by the present appraisal, but as noted above, this loss will probably be increased to some extent during the course of liquidation by depreciation and obsolescence. *Interest* in the aggregate of $3,153,570.08 has been paid on outstanding first mortgages and Certificates in the hands of investors during the period from 1933 to 1939, or approximately 3% per annum (Appendix No. 1) on the average amount of guaranteed investors' holdings. No impartial review of this business can avoid the conclusion that on the whole the outside investors in the Mortgage Company will, if the business is properly reorganized, lose relatively less in the aggregate than investors in most securities issued by other mortgage companies; and in many other securities, such as stocks and many railroad and industrial bonds, as well as many bank depositors. The foregoing refers only to the general picture, since the situation is different in each individual case and some particular investors are unfortunate in having certificates in some of the worst of the mortgages.

"Nor does this mean that the original investments were sound. The contrary now is apparent. However, it is easy to criticize business judgment long after the event, and in any event it would hardly be profitable to go back of 1933 and the practically unanimous adoption of the 1933 Plan, to investigate criticisms arising from the original sale of mortgages. The Trustee has not attempted, therefore, to make an investigation which would take many months, as to the propriety of the original investments or to consider any causes of action that might have existed at one time with respect to them."

We adopt as a very succinct, accurate and sufficiently adequate outline of the Plan the following summary of the Trustee:

"It provides for the conveyance of the Debtor-owned properties to a New Company. It further provides for the issuing against each of the properties to the Certificate Holders originally secured thereby, of new First Mortgage Certificates, which give the holders a right to the pro rata part of the principal and the net income as collected until the face amount of the Certificate and 4½% cumulative interest is paid thereon. [And also 1% additional interest to be deferred and accumulated, but not payable until final disposition of the property.] Excess income is to be used for a sinking fund. Where the net appraisal shows no equity in excess of the claims of First Mortgage Certificate Holders, they will be entitled to the entire proceeds of the mortgaged property.

"In like manner, the holders of Junior Mortgages where the appraisal indicates an equity in the property over the First Mortgage but no equity over the Junior Mortgage, receive the entire net proceeds after the payment of the new First Mortgage Certificates, and in cases where there is an equity over the Junior Mortgage, the Junior Mortgage will receive such proceeds until the mortgage claim is paid in full.

"Each security holder receives likewise a claim as general creditor against the Debtor's general assets in proportion to their deficiency claims; and where the net appraisal of any property indicates an equity in excess of the Mortgages thereon, any further proceeds of the property after payment of the claims of all mortgages against that property will be distributed among general creditors.

"Stockholders are eliminated.

"The management is placed ultimately in the hands of three Voting Trustees, who will likewise act as Directors and will have had no prior connection with the Debtor, and who are experienced in such matters. The Trustee has nominated Messrs. L. Alan Dill, President of Hopkins Place Savings Bank; John J. Ghingher, President of National Central Bank and former Bank Commissioner of Maryland; and Charles L. Phillips, Executive Vice President of the United States Fidelity and Guaranty Company. The Plan therefore, it will be perceived, is a plan for orderly liquidation under the supervision of experienced persons to whom no objection has been made. The Plan contains all of the necessary powers. The Plan further permits the operation of the properties by the New Company to the extent deemed advisable, but requires—

"(1) The transfer of the property management functions to an outside management agent at any time upon the request of the holders of two-thirds in amount of the First Mortgage Certificates:

"(2) The conveyance of the title upon unanimous request of all holders—i. e., where no minority is involved; and

"(3) The conveyance of the title and the right to determine the price at which (any specific part of) the property will be liquidated, and other similar matters, upon the request of two-thirds of the Certificate Holders (in such specific part), to any person approved as to qualifications by the Court or by the Trustees, or to any bank or trust company. In this manner any possible objections by Certificate Holders to the management of the Debtor prior to the reorganization are entirely eliminated.

"The Plan contains many other provisions designed to meet the complicated legal problems in a fair manner which it is not necessary to summarize, since they relate to details and do not affect the general principles.

"In accordance with the provisions of the Chandler Act, the Plan must be accepted by two-thirds in amount of the holders of First Mortgage Certificates against any Debtor-owned property whose claims have been filed and allowed, in order to apply to such property.

"With respect to third party mortgages, the Plan is compulsory only with respect to the guaranty, and is voluntary and binds only assenters with respect to the security and the covenants of the third party mortgagors. Here the purpose is to allow the holders of unforeclosed mortgages to get together in preparation for foreclosure or extension of Mortgages, in so far as they may wish to do so, and to thereby remove the defect in these divided ownership securities, under which, in the absence of such a Plan, unanimous consent is required for any important action, such as a sale, foreclosure, extension or the like."

It will thus be seen that the Trustee's Plan is primarily for the purpose of removing the defects of a divided ownership certificate under which an average of twenty-six owners hold interest in some three hundred and fifty mortgages or properties. In all, there are some 3,600 certificate holders. For the past seven years unsuccessful efforts have been made to enable these unfortunate investors to realize upon their certificates. Both the 1933 Plan and its abortive successor, the 1937 Plan, failed, resulting in the present proceeding, which was filed on September 21, 1939, pursuant to the provisions of Chapter X, 11 U.S.C.A. § 501 et seq. The Trustee merits the high-est commendation for his sound judgment, diligence and thoroughness ever since his appointment to what has been a very difficult task, because of the great number of certificate holders and the multiplicity and intricacy of the questions, both legal and practical, inherent in the Debtor's transactions, and in the tragic extent of its failure to meet its obligations. Likewise, Mr. Randall, the operating Trustee appointed by the court and who had been president of the Company since 1933, has performed his arduous duties most satisfactorily since his appointment. The Trustee has filed a most exhaustive report; he invited suggestions for a plan of reorganization as early as May, 1940, and has periodically kept, in so far as possible, all creditors advised of his own progress with respect to drafting a plan and has invited suggestions with respect thereto. The present Plan was proposed to the court on October 30th, although it had been put in the hands of interested parties a month previously. A series of full hearings have been had, many objections to the Plan have been filed and fully heard. These have either been answered in this court's opinion dealing with the question of jurisdiction, or are believed to be without merit, or of a relatively unimportant character. Therefore, it becomes unnecessary to consider them in any detail.

The provision in the Plan permitting the complete surrender, at any time, of any specific property upon the desire of two-thirds or more of the certificate holders in any such property, upon conditions adequate to protect fully the rights of minority holders, resulted from proposals which the Court itself made incident to developments at the hearing. This provision should add greater flexibility to the Plan; should compensate, to some extent at least, for the obvious inability to fix at this time any maturity date for the new certificates which would not be the creature of pure speculation; and lastly, should satisfy those certificate holders who may, as is reasonable, prefer to assume title to, and responsibility for the liquidation of the property which is the vastly depreciated, and for the most part "frozen", security for what the Debtor owes them. We believe that, with this change the Plan, as originally filed by the Trustee, is fair, equitable and feasible, subject only to a few other relatively minor changes which have either been assented to by all parties in interest attending the hearing, or if not so assented to, relate to

procedural or incidental matters, and do not call for analysis or explanation in this opinion.

We concur in the position taken by the Trustee that any plan which provides for keeping the properties so far as possible under one management, ultimately controlled by the certificate holders, and the preservation and realization of their rights upon the value of the liens which they now have, would seem to be far and away the most fair, equitable and feasible plan. Plans which involve separate reorganizations or separate foreclosures or provide for dispersing the properties would, we believe, be vastly more disadvantageous to creditors as a whole, since the cost of many separate proceedings and the cost of managing separate properties would, in all probability, exceed the cost of reorganizing all of them in one proceeding, and from the point of view of complete ultimate liquidation would extend rather than reduce the time involved.

More than 95 per cent in amount of the mortgages (there are more than 365 separate first mortgages) are held in divided ownership. The number of certificate holders in each mortgage ranges from two to three up to over one thousand per mortgage, and the average is twenty-six. Manifestly, as the Trustee stresses, it is essential that all management functions in any one mortgage be centered in one agency, if collections, extensions, foreclosures, property management and other duties are to be effectually performed. Any alternative or liquidation of the Debtor, leaving the certificate holders to get together on each property and arrange some effective means of managing each of the 365 separate mortgages, would plainly be, for the most part, disastrous. There are 3,848 investors holding approximately 9,537 mortgage interests, eliminating cases where a holder's interest is represented by more than one certificate in a mortgage. The average investor is, therefore, interested in between two and three mortgages. Some investors are interested in many more. Thus, if there were liquidation the average investor would have to deal with two or three different sets of co-owners numbering on the average 26 in each mortgage in which he is interested, often in different cities. Furthermore, since the stockholders have no interest on which they can realize in the present reorganization, because the Debtor is insolvent, the basic question is the desirability of the creditors' continuing an agency subject to their sole control for the purpose of managing their investments. The question is: Are these investors, nearly 4,000 in number, having separate interests in some 365 mortgages better off under a plan for a reorganization and the continuation of one agency to manage the property, or under some other plan? We agree with the Trustee that there appears to be no preferable alternative. Forced liquidation of the Debtor in this or a State court would defeat the very object sought to be attained. The amount of dividends from free assets would be negligible. It is plainly impossible to have foreclosure or other sales of the various properties to outsiders, since a great many of the properties are not salable at the present time. Also, any such alternative procedure would be much more costly because of the increase in the cost of separate proceedings. It would be much more difficult to provide equitably in a separate manner for each property, and it would be unsatisfactory to the average investor who is interested in two or three mortgages and who it may reasonably be assumed would rather have one reorganization than two or three.

Without attempting further to analyze the details of the Trustee's Plan, we believe for the aforegoing reasons that it is far superior to any of the other proposals that have been submitted. Also, for the reasons given, and because for the most part what may be called the individual plans relating to separate properties, particularly those proposed by the Title Guarantee & Trust Company, do not adequately protect the prior position of first mortgagees, we are not in favor of approving separate plans for any of these properties.

The Plan has been submitted to the Securities and Exchange Commission for its examination and advisory report pursuant to the requirements of the statute. The Commission has filed its report, which has been duly considered by the court, but is believed to contain no suggestions of sufficient merit to warrant their adoption.

It is significant to note that the Realization Plan Committee, with whom approximately 82 per cent of the certificate holders had heretofore deposited their certificates under the 1937 voluntary Plan, already referred to, has approved of the Trustee's Plan, and has announced that it will recommend its adoption to the depositors.

To conclude, we believe that the Plan submitted by the Trustee with the amendments which have been approved and directed to be made, is fair, equitable and feasible, and complies fully with the provisions of the statute. Therefore, an order will be entered approving it, and fixing a time within which creditors may accept it.