## In re MORTGAGE GUARANTEE CO.

### No. 9320.

District Court, D. Maryland.

July 12, 1941.

Ritchie, Janney, Ober & Williams, and Frank B. Ober, all of Baltimore, Md., for trustees.

Semmes, Bowen & Semmes and Frederick W. Brune, all of Baltimore, Md., for Certificate Holders Reorganization Committee.

J. Cookman Boyd, Jr., of Baltimore, Md., for Property Management, Inc., and others.

Harry E. Karr, of Baltimore, Md., for Title Guarantee Co. and another.

Jacob S. New and Hyman Paul Rome, both of Baltimore, Md., for Independent Certificate Holders Committee.

Robert H. Winn, of Washington, D. C., for Securities & Exchange Commission.

COLEMAN, District Judge.

This opinion deals solely with allowances of compensation for services rendered in connection with the reorganization of the Mortgage Guarantee Company pursuant to the provisions of Chapter X of the Bankruptcy Act, 11 U.S.C.A. §§ 501–676, inclusive.

In this very involved proceeding, in the course of which the Court held no less than 19 hearings, various opinions have been rendered as the proceedings progressed through their various stages. On the 27th day of May, 1941, a plan of reorganization was confirmed by the Court. This plan and the Court's reasons for its confirmation are fully set forth in 36 F. Supp. 988.

The individuals or corporations to whom compensation may be allowed in a proceeding of this kind and the amount thereof, are defined by §§ 241, 242 and 243 of the Bankruptcy Act, 11 U.S.C.A. §§ 641, 642 and 643. These sections are as follows:

Sec. 241: "The judge may allow reimbursement for proper costs and expenses incurred by the petitioning creditors and reasonable compensation for services rendered and reimbursement for proper costs and expenses incurred in a proceeding under this chapter—(1) by a referee; (2) by a special master; (3) by the trustee and other officers, and the attorneys for any of them; (4) by the attorney for the debtor; and (5) by the attorney for the petitioning creditors.

"Such compensation of referees and trustees shall not be governed by sections 68 and 76 of this title."

Sec. 242: "The judge may allow reasonable compensation for services rendered and reimbursement for proper costs and expenses incurred in connection with the administration of an estate in a proceeding under this chapter or in connection with a plan approved by the judge, whether or not accepted by creditors and stockholders or finally confirmed by the judge— (1) by indenture trustees, depositaries, reorganization managers, and committees or representatives of creditors or stockholders; (2) by any other parties in interest except the Securities and Exchange Commission; and (3) by the attorneys or agents for any of the foregoing except the Securities and Exchange Commission."

Sec. 243: "The judge may allow reasonable compensation for services rendered and reimbursement for proper costs and expenses incurred by creditors and stockholders, and the attorneys for any of them, in connection with the submission by them of suggestions for a plan or of proposals in the form of plans, or in connection with objections by them to the confirmation of a plan, or in connection with the administration of the estate. In fixing any such allowances, the judge shall give consideration only to the services which contributed to the plan confirmed or to the refusal of confirmation of a plan, or which were beneficial in the administration of the estate, and to the proper costs and expenses incidental thereto."

It is to be noted that with respect to (1) costs and expenses, reimbursement may be allowed provided they are "proper"; and that (2) with respect to compensation for services, such compensation must be "reasonable". Underlying these statutory requirements, there are general principles which must govern any allowances in a proceeding of this kind. It is well established that in determining the reasonableness of requested allowances of compensation for services in corporate reorganization proceedings, the character and extent of the particular services, the assets of the debtor corporation and the results finally attained by reorganization, with particular relation to losses sustained by security holders and their creditors, must be considered. Such allowances, while they must be fair, must be moderate as opposed to liberal. What might be or has been customarily paid, or what might be entirely reasonable under normal circumstances, is not controlling. The rea-

sonableness of such allowances cannot be determined on a percentage basis. At best, the latter is only prima facie persuasive of what should be allowed. Nor can such services be gauged by time-clock methods. The American Bar Association in its canons of ethics (No. 12) has stated that in determining the amount of attorneys' fees, generally, "it is proper to consider: (1) the time and labor required, the novelty and difficulty of the questions involved and the skill requisite properly to conduct the cause; (2) whether the acceptance of employment in the particular case will preclude the lawyer's appearance for others in cases likely to arise out of the transaction, and in which there is a reasonable expectation that otherwise he would be employed, or will involve the loss of other employment while employed in the particular case or antagonisms with other clients; (3) the customary charges of the Bar for similar services; (4) the amount involved in the controversy and the benefits resulting to the client from the services; (5) the contingency or the certainty of the compensation; and (6) the character of the employment, whether casual or for an established and constant client. No one of these considerations in itself is controlling. They are mere guides in ascertaining the real value of the service."

Obviously, these factors are not the only ones that are to be considered in fixing allowances to lawyers in reorganization proceedings. Nor do all of them always have application to the particular case. Some may be an appropriate guide when used in connection with other factors.

This Court has frequently had occasion to consider and apply the aforegoing principles in proceedings under Chapter X of the Bankruptcy Act and more particularly in proceedings under Section 77B of that Act, 11 U.S.C.A. § 207 of which Chapter X is an amendment. See especially In re Consolidation Coal Co., D.C., 14 F.Supp. 845; In re United Railways & Electric Company of Baltimore, D.C., 15 F.Supp. 195.

We will now proceed to take up the various requested allowances. No particular order of their consideration is deemed necessary, but they may, for convenience, be divided into two broad classes: (1) allowances requested by attorneys for professional services rendered; and (2) allowances requested by other individuals,

banks and bankers. It is noteworthy that the expenses for which reimbursement is requested are of a surprisingly small total amount, less than $4,000. The various separate items of expenses will be taken up in each separate case.

Claim of Frank B. Ober, for $65,000, for legal services. Mr. Ober was appointed by the Court as the "disinterested" trustee pursuant to the provisions of the Act, on September 21st, 1939, and has served continuously in that position for approximately twenty-one months. Under the Act, it would have been permissible for the Court to have appointed an attorney to represent Mr. Ober, but his selection as trustee was made largely with the view of consolidating trustee and attorney in one person for the purpose of thereby keeping down as much as possible the cost of administering the debtor corporation throughout the reorganization proceeding. At the time of Mr. Ober's appointment, he had had very broad experience in corporate reorganizations, including experience in the highly specialized field of mortgages. The confidence which the Court placed in him has been completely justified by the manner in which he has performed his services throughout this long and very tedious proceeding. The vast majority of the questions with which he has had to deal have involved legal principles. That this would be true was evident to the Court at the outset and, therefore, Mr. Ober's selection has unquestionably resulted in economies which would not otherwise have been possible had some one not a lawyer been appointed to this position, or if it had not been understood that Mr. Ober would be expected to perform the combined services of trustee and attorney, except, of course, in certain special matters. A few occasions for such special employment of attorneys has arisen, as hereinafter referred to, but with relatively little additional expense.

It is obvious that in a reorganization proceeding of this kind, particularly since, pursuant to the provisions of Chapter X, the trustee is charged with the duty of preparing and filing a plan of reorganization, the trustee becomes the most important person connected with the reorganization and the one to whom the Court must look for the greatest amount of service. It is not deemed necessary to set forth here in full detail the work that Mr. Ober has performed. It is disclosed in great detail in his petition and was further elaborated upon by him at the hearing. Suffice it to say that the Court knows that Mr. Ober has, during the past twenty-one months, been required to work upon a great variety of questions, many of them very difficult and intricate, and to quote the following from his petition which the Court believes is a fair summary of what Mr. Ober has done: "The time record indicates that your petitioner and his associates spent, during a year and three-quarters, 6,500 hours up to June 6, the date of the filing hereof (last week estimated). Of this amount, some 2,900 hours were spent by your petitioner personally. In transposing such time records into years, it should be noted that your petitioner's firm finds that in normal years the average time put on the time records amounts to from 1500 to 1600 hours a year, including a normal amount of overtime and night work, for the reason that a complete record of every minute spent—in the absence of some detailed system such as is carried out by New York firms—is impossible, much of the time being in short telephone calls and the like, which are not recorded. Referring to petitioner's personal time, it appears that of the recorded time he spent some 78% of his total time on this one matter during the period in question, but in computing the total time it should be noted that your petitioner worked on such an unusual number of nights, holidays, Saturdays and Sundays during the past year and eight months that it can fairly be stated that he gave substantially full average time for this period on this one case and that the amount of time spent on other matters consisted wholly of unusual overtime work. To translate the entire time record into years would indicate that the work was equivalent to between four and five years of one person's time. Your petitioner was required, at a considerable sacrifice of other considerations, to give practically all of his time to this one matter because a reorganization had to be completed as promptly as possible or not at all. This was so because, in the first place, reorganization efforts had been continued for a period of six years prior to his appointment, and the two voluntary plans had not been wholly successful, so that creditors, many of whom had not received interest for six years and who had no manner of realizing on their security because of the impossibility of liquidating the same without unanimous consent, were

necessarily becoming more and more difficult to deal with. In the second place, as a matter of public policy, many of these investors had all their savings tied up in such nonproductive investments and were in actual need, and it was important to provide the machinery for liquidation. In the third place, the attacks by various groups and litigation over a period of years made it quite probable that the whole thing would break up, so that there would be a grand scramble in the various properties unless some practicable plan could be worked out in a reasonably short time. The danger of this latter possibility is illustrated by the strong jurisdictional attack made a year after the reorganization proceedings commenced.

"The general result of this reorganization proceeding is that some 95% of the properties and mortgages involved, having an appraised value of $10,850,000 (less a few sales since) have been brought into a reorganization plan for orderly liquidation, as reasonably simple as was possible under the circumstances, by the overwhelming vote of 75–80% of the creditors in a period of about a year and eight months." Mr. Ober has received as yet no compensation whatsoever for his services. At the time of his appointment, the Court naturally gave careful consideration to the thought that he should be placed at once upon a salary basis or at least paid monthly, at a rate of compensation which would approximate fair compensation for his services as rendered. The Court concluded, however, that because of the unusual circumstances and the inability to determine in advance the extent and the character of the work, that it would be best to postpone any attempt at fixing a rate of compensation, this postponement being acceptable to the trustee.

■ We conclude that tested by the rule set forth at the commencement of this opinion which must govern, the amount requested by Mr. Ober is appropriate under the circumstances and will therefore be allowed. In short, we believe that such an allowance is fully consistent with the basic rule that in a proceeding of this kind, the allowances must be moderate, yet fair. We are satisfied that should an attorney of Mr. Ober's skill, reputation and experience render comparable services to a corporation not in financial difficulties, a reasonable fee for such services might well be considerably more than the amount now

being allowed. Finally, it is significant, although, of course, not conclusive, that although the Court at the hearing invited the fullest criticism of this requested allowance, as it did indeed of all other requested allowances, not a single objection has been interposed as to the amount requested by Mr. Ober, except blanket opposition, voiced by individuals who were admittedly not in any sense conversant with the character and extent of Mr. Ober's services.

■ Claim of Blanchard Randall Jr., for $5,000, for services as operating trustee. This claim is in addition to the salary which he has been paid since his appointment on September 21, 1938, at the rate of $500 per month. We conclude that this requested allowance is also reasonable and should be granted. Mr. Randall has proved a most satisfactory operating trustee. The rate at which he has been compensated is the same which he received from the debtor company from the time that he became president of it in 1933 until it went into reorganization proceedings in this Court and he was appointed its operating trustee. During his presidency of the Company he had periodically sought and been given reasonable ground to expect that he would receive some increase in his salary as soon as the condition of the Company warranted, but such never occurred. During the twenty-one months that he has served under Court appointment, his work has entailed supervision of the Company's general offices and its staff of employees in Baltimore and Atlantic City, and of its agents in Atlantic City and Washington who have performed the normal operating functions in the management of several hundred parcels of real estate, including dwellings, apartments, store, office and special purpose properties, with some 1,500 tenants, and in the operation of three hotels. His work has included supervision of operations, maintenance and personnel; the payment of expenses and taxes as well as making leases, collecting rents and complete accounting. The gross rentals of the real estate which he has managed have exceeded $1,250,000, and the gross income from the three hotels has exceeded $1,150,000. Obviously, the business of the debtor company absolutely required separating the duties to be performed that were directly related to the preparation and adoption of a plan of reorganization, and those duties which related to the current operations of the Company. It was not rea-

sonable to expect the disinterested trustee (Mr. Ober) to perform both functions or, vice versa, to expect the operating trustee (Mr. Randall) to do so.

Mr. Randall, by reason of his long experience with the Company, even though it had gone through deep waters, seemed to the Court to be peculiarly fitted to carry on the work pending reorganization. The confidence which the Court placed in him has been fully justified.

In addition to the duties already enumerated, the normal work of the operating trustee also embraced supervision of the collection of interest and principal from mortgagors, the distribution of the same with the net operating income from real estate to the proper investors, as well as transfer of mortgage certificates and other duties of mortgage servicing, with appropriate accounting; negotiation for mortgage extensions, settlements and collection of accounts. The interest collected by the operating trustee during his twenty-one months of service from all sources, including that from real estate, was approximately $650,000 and the principal collected approximately $7,500,000.

Furthermore, because of the peculiar relationship of investors to specific mortgages, it was necessary to keep the income and expenses of approximately 350 properties or mortgages, separated, and carefully to preserve the distinction between the different corporations and the various mortgaged properties. This made accounting far more burdensome and difficult than in most enterprises of similar size. In the aggregate, the debtor company and its affiliates had outstanding approximately $13,000,000 face value of first mortgages, and approximately $1,500,000 face value in second mortgages.

It is contemplated that Mr. Randall's services as operating trustee for which he has been paid the $500 monthly salary, will be completed within the next two or three months, when his services and compensation will, pursuant to Court order, entirely terminate.

■ Claim of Hilary W. Gans, for $750, for legal services. Mr. Gans was appointed special counsel by the trustee upon Court authorization of April 29, 1940, to investigate and report with respect to the validity of loans made by the Fidelity Trust Company and the Title Guaranty & Trust Company, to the debtor company. Mr. Gans worked from the above date until July 17, 1940, consuming approximately 15 days of his full time.

This is one of the few instances in which it was found necessary to appoint for a special and very limited purpose, an attorney to the trustee as authorized by Section 157 of the Act, 11 U.S.C.A. § 557. We are satisfied that $750 is reasonable, proper compensation for the legal services which he rendered.

■ Claim of Harry Miller, for $4,205, for legal services, and $242.67 for out of pocket expenses. Mr. Miller, attorney of Atlantic City, New Jersey, was employed by the trustee pursuant to order of Court of October 24, 1939, to furnish routine advice and to conduct ordinary legal proceedings arising out of the leasing and management of property in Atlantic City belonging to the debtor company. He has already received $795 in part payment of these services during which he expended in all between 550 and 600 hours.

While, as already stated, it is unfair and indeed it would be impossible to fix a fee for services of this kind by a yardstick or rule of thumb method, it would appear in spite of the considerable amount of time expended by Mr. Miller, that the services were not of an extraordinary character and since all allowances must be moderate in a proceeding of this kind, we conclude that to allow Mr. Miller an additional $3,000 will be proper compensation under the circumstances, plus reimbursement for his expenses in the amount of $242.67 as claimed.

■ Claim of Philander B. Briscoe, for $225, for legal services, and $30.31 for out of pocket expenses. Mr. Briscoe was also employed by the trustee pursuant to order of Court of April 29, 1940, for the collection of rent claims and other matters connected with the operation of the debtor company's real estate in Baltimore and vicinity. Mr. Briscoe has as yet received no compensation for these services which appear to have been satisfactorily performed. Itemization of them shows the amount requested to have been earned. Accordingly, it will be allowed, together with reimbursement for the stated expenses.

■ Claim of Vincent S. Haneman, for $125, for legal services. Mr. Haneman, attorney of Atlantic City, New Jersey, was also employed by the trustee to represent

him in opposing the transfer of a plenary retail consumption license (liquor license) to an occupant of property in the vicinity of one of the debtor company's properties in Atlantic City, on the ground that such license transfer would be detrimental to the debtor company's property. Mr. Haneman was successful in the task for which he was employed, and has as yet received nothing for his services.

We believe that the sum requested is reasonable compensation and therefore will be allowed.

Claim of Edwin W. Poe, for $4,500, for services as secretary to Certificate Holders Committee. Mr. Poe, a resident of Baltimore, with extensive experience in administrative matters connected with corporate reorganizations, was employed by the Certificate Holders Reorganization Committee as its secretary from the date of the Committee's organization in June, 1937, and he is still acting in that capacity. To date he has received as compensation for his services $5,500; one-half from the Committee and the other half being paid by the debtor company prior to the institution of these Court proceedings.

■ All three members of the Committee have supported Mr. Poe in his petition for the requested allowance, namely, they state that in their opinion he has earned a total compensation of $10,000. His work consisted of attending numerous meetings of the Committee, keeping its records, minutes and correspondence, interviewing the security holders, conferring with the Committee's counsel, etc. However, it further appears that since these Court proceedings were instituted, that is, for the past year and three-quarters, Mr. Poe has done a relatively small amount of work. It, therefore, seems to the Court that an additional allowance of $1,500 is a proper, reasonable remuneration which should be charged against the costs of the present proceeding.

Claim of the Baltimore National Bank, Baltimore, for $21,921.02, for depositary services. This claim is for services and expenses in acting as the debtor company's depositary from April 1, 1938, to June 1, 1941; that is to say, the claim is for approximately $7,000 a year for three years. All of it is for services, except $500 for out of pocket expenses. It appears that at the time these proceedings were begun, there was on deposit with the Certificate Holders Reorganization Committee through the Baltimore National Bank which had been acting as the Committee's depositary, nearly $11,000,000, the aggregate principal amount of mortgages, mortgage participation certificates and mortgage assignments, such certificates and assignments having been deposited with the Committee under a deposit agreement in connection with the so-called voluntary plan of reorganization proposed prior to the commencement of the present proceedings. It further appears that prior to May 1, 1941, the holders of more than $8,000,000 in aggregate amount of secured claims, and of more than $3,000,000 of unsecured claims, acted through this Committee in consenting to the plan of reorganization that has been confirmed by this Court.

Except for special services not included in any recognized schedule of fees, the charges which are embraced in the Baltimore National Bank's claim are based upon the standard rates approved by local and other fiduciary associations for the services of a depositary. The Bank claims that although such standard rates are reasonable for services rendered by a depositary in connection with a normal and usual reorganization, such standard rates are very low in the present case because of the nature and extent of the required services as distinguished from services required of a depositary in the usual reorganization.

It is explained that the ordinary depositaryship involves only one or two issues of bonds in bearer form, of even denominations, and possibly one or two issues of stocks; but that the present case involves participation certificates issued against approximately 360 different mortgages and that thus the depositaryship is involved in effect in 360 different issues, instead of merely a few. Furthermore, it appears that the participation certificates, instead of being in even denominations, have been issued in all kinds of odd amounts from $20 up to $195,000, and in odd dollars and cents. The number of participation certificates under any one particular mortgage has varied from 3 up to 1,500. The participation certificates have been in registered form and in a number of cases have been accompanied by title policies which had to be examined. The number of participation certificates deposited with the Bank aggregated 8,810 with a total par value of approximately $11,000,000. The number of certificates of deposit has been substantially reduced by withdrawals and payments from time to time, all of which required extra services. In short, it is asserted that

the operation of this depositaryship has required a vast amount of work and time on the part of the officers of the Bank as well as its clerical staff in comparison with the routine services usually required under an ordinary depositaryship. It is stated that in the latter this Bank would keep a record for each issue of bonds, necessitating not over two or three accounts; where in the present case, it has been required to keep a record of approximately 360 accounts since a separate account must be maintained for each mortgage; that whereas in ordinary depositaryships the depositor's record is kept for each issue of bonds deposited, in the present case it has been necessary not only to keep a record covering the depositor's participation holding in each mortgage, but also to keep a record showing his entire holdings in the various mortgages, and there have been numerous instances where the same individual held interests in a number of mortgages. Likewise, in safekeeping the participation certificates, it was found necessary to devise a special method of filing and of vault protection.

While we do not question the accuracy of the aforegoing representations or the fact that the Baltimore National Bank has done most satisfactory work, to which both trustees have certified; and while furthermore, we recognize the fact that real economy and administrative efficiency have been accomplished by the continuation of the Baltimore National Bank as depositary during these Court proceedings, nevertheless, we feel that some reduction in the amount of compensation claimed must be made in view of all of the circumstances of the present case. The rates used by the Bank in making up its bill for services are, as already stated, the regular ones, namely, 50¢ for deposit of a participation certificate; the same for issuance of a certificate of deposit; 25¢ for setting up and maintaining a ledger record, and small custodian charges at the regular percentage rates. It is true that this Court has allowed to depositaries, including the present one, compensation for similar services computed on the standard customary rates. See In re Consolidation Coal Co., supra. However, this Court was careful to point out that "approval in the several instances, just considered, of the local standard rates is not to be taken as an acceptance of their reasonableness in all cases. When the number of bonds serviced becomes very large, adherence to such rates might not be justified." 14 F.Supp. 845, at page 854.

This Court applied this rule and reduced the allowance below the standard rates, in Re United Railways & Electric Co. of Baltimore, supra. In the present case it has been stated on behalf of the depositary that it is inherent in the nature of the services that their actual cost cannot be accurately ascertained. Assuming this to be true, nevertheless under all the circumstances, the present request is believed to be somewhat too high.

Accordingly, the Court concludes that a total allowance of $18,000 to the Baltimore National Bank is reasonable compensation to it for the services rendered and expenses incurred.

In this connection it is to be noted that the members, three in number, of the Certificate Holders Reorganization Committee, have not petitioned for any compensation to themselves but that in addition to petitioning for compensation to its secretary, Mr. Poe, and to its depositary, the Baltimore National Bank, in the amounts specified, the Committee has asked for an allowance to cover a bank loan which it made to defray its current expenses, the amount of this indebtedness now being $3,022.50, including interest. The Committee has on hand or accruing to it, approximately $4,200 consisting for the most part, of fees charged to certificate holders for withdrawals of their certificates. This amount the Committee may properly apply to liquidation of its loan and the balance to its depositary or its secretary, or both. However, it does not appear that these latter petitioners are otherwise entitled to additional compensation other than that just specified.

Claim of Semmes, Bowen & Semmes, for $35,000, for legal services. The services here involved were rendered by Semmes, Bowen & Semmes as counsel to the Certificate Holders Reorganization Committee for approximately four years, that is, commencing in the summer of 1937. They have as yet received no compensation for any part of these services. Next to the work performed by the trustee, Mr. Ober, it may be said with entire accuracy that the services of the Committee's counsel performed, for the most part, by Frederick W. Brune, one of the senior partners of Semmes, Bowen & Semmes, has been of the greatest value in the prosecution of the Court proceedings terminating in the adoption of the plan of reorganization for the debtor company. Furthermore, while it is true, measured in

terms of hours consumed, the services of Messrs. Semmes, Bowen & Semmes were very much more extensive prior to, than since the institution of these Court proceedings, this earlier work had to do with a plan that failed of fruition and which differed drastically from the plan which has been evolved through these proceedings. Nevertheless, it is unquestionably true that the work of the counsel to the Committee performed prior, as well as subsequent to the institution of these proceedings, did a very great deal to facilitate the reorganization that has been accomplished.

In fixing the allowances that are to be granted in a proceeding of this kind, the Court must, of necessity, depend largely upon the judgment and recommendations that its trustees make to it with respect to the work performed by others in the reorganization proceeding, and the estimated value of same. In the present instance, the Court is most fortunate in having in Messrs. Ober and Randall, persons who will voice frankly and fully their views regarding such services irrespective of the delicacy and embarrassment that usually attends criticism by one person of the services of another. Indeed, the Court is entitled to have such frank and full statements from those whom it has appointed to act for it in cases of this kind, because as just stated, it must, of necessity, rely to a very large extent upon the advice and assistance of such persons. In the present case, the trustees have freely asserted that they feel that Messrs. Semmes, Bowen & Semmes are entitled to be allowed for their services the amount which they have asked. The Court is in accord with their views and feels it unnecessary to set forth in this opinion a detailed analysis of these services, which are stated to have been the equivalent of 560 ordinary working days, about 20% of which were subsequent to the institution of these proceedings. Again, suffice it to say that these services cannot be measured by yardstick or by rule of thumb or on the basis of so much per day.

In making this and all allowances herein which include services antecedent to the inception of these proceedings, we have kept in mind the mandate of the Act (§ 243, 11 U.S.C.A. § 643) heretofore quoted, to the effect that "In fixing any such allowances, the judge shall give consideration only to the services which contributed to the plan confirmed or to the refusal of confirmation of a plan, or which were beneficial in the administration of the estate, * * *." The trustees have asserted, and we accept it as true, that counsel for the Committee contributed immeasurably to the plan as confirmed and that their services were incalculably beneficial in the administration of the Debtor's estate. The very fact that Mr. Brune was so intimately connected for more than two years with the affairs of the debtor company prior to the Court proceedings, rendered him extraordinarily well qualified to assist the Court and its appointees in the tedious task of salvaging the debtor's property to the best advantage of its many creditors, large and small. There is little resemblance, to be sure, between the voluntary plan of reorganization which the Committee attempted, unsuccessfully, to put into effect and the plan evolved through these proceedings. But the experience and knowledge acquired by the Committee's counsel in their earlier efforts, unquestionably made the later work easier and of earlier accomplishment than would otherwise have been the case. To say that the fullest recognition, consistent with the other factors involved, should not be given to services of this kind is akin to giving support to the mediaeval doctrine that a physician should not be compensated irrespective of his skill and untiring efforts, if the patient under his care, by reason of natural causes beyond his control, fails to recover.

There is also allowed to Semmes, Bowen & Semmes $302.61, their proven out of pocket expenses.

Claim of Stein Bros. & Boyce, for $17,178.14, for services as deposit agents. This co-partnership asserts its claim pursuant to the terms of a formal agreement which it executed with the Committee and the debtor company as of June 7, 1938. By this agreement Stein Bros. & Boyce were to receive an overriding or management commission of $\frac{1}{4}$ of 1% of the principal face amount of all of the debtor company's certificates whose deposit with the Committee it effected. In addition, the agreement called for the payment of $\frac{1}{2}$ of 1% to other investment houses employed by Stein Bros. & Boyce, upon such deposits as they secured. It appears that through the efforts of Stein Bros. & Boyce and those associated with them for approximately a year and a quarter prior to the institution of the present proceedings, the deposit of some $3,000,000 was obtained.

The present claim is based upon the aforementioned rates provided in the agreement. Under that agreement there has been paid to date to Stein Bros. & Boyce and their associates a total of $17,177.85, or approximately one-half of the total amount claimed to be due. In addition, they have received $5,000 in reimbursement of actual out of pocket expenses evidenced by vouchers. Since the institution of these proceedings and pursuant to the provisions of the Bankruptcy Act, Stein Bros. & Boyce and their associates suspended all further solicitation of deposits. The aforementioned rates of compensation provided in the agreement upon which Stein Bros. & Boyce base their claim were approved by the Reconstruction Finance Corporation. This is mentioned because of the fact that the 1937 reorganization plan of the Committee was based upon a loan by the Reconstruction Finance Corporation.

In determining what if any allowance should be granted to Stein Bros. & Boyce out of the assets of the debtor company, the same considerations are applicable as in the case of the application of Mr. Poe, secretary to the Committee; the application of the Baltimore National Bank, the Committee's depositary, and the application of Semmes, Bowen & Semmes. This Court is not disposed to adhere rigidly to the terms of an agreement whose terms we may assume were entirely reasonable when made, but which long antedated the Court proceedings and which has never been approved or accepted as still binding. The trustee while recognizing the prima facie plausibility of the claim of Stein Bros. & Boyce for reasonable compensation in view of the character and extent of their services, which the court believes were beneficial in the administration of the affairs of the debtor company, nevertheless has opposed any allowance. However, the court will allow $13,000, believing that to be reasonable, proper compensation under all the circumstances.

Claim of Beeuwkes, Skeen & Oppenheimer, for $3,500, for legal services. These attorneys acted as attorneys for Stein Bros. & Boyce, whose claim has just been considered, for approximately a year and a quarter, that is, from June 7, 1938, to September 17, 1939, a period which entirely antedated the present Court proceedings. No request is made for compensation for any services during the period of reorganization in this Court.

This Court is of the opinion that since, as we have found, Stein Bros. & Boyce are entitled to moderate compensation for their services, by the same principle, their counsel are entitled to be compensated if they have in fact rendered legal services to their clients in connection with the latter's performance of its duties as the deposit agents to the Committee. An examination of the sworn petition of Beeuwkes, Skeen & Oppenheimer, considered in the light of Mr. Oppenheimer's oral testimony given at the hearing, satisfies the Court that the requested allowance of $3,500 is fully justified under the circumstances. It appears that these attorneys spent approximately a month and a half of working days on legal matters for their clients which were in effect, services to the Committee itself and therefore, comparable in character but of course not in any sense in extent, to the services performed for the Committee by Mr. Brune of Semmes, Bowen & Semmes. Mr. Brune has stated that he considers the services of Mr. Oppenheimer to have been very helpful in the ultimate progress of the present proceeding. The trustee, Mr. Ober, is of the opinion that the services rendered are not entitled to the full compensation requested. However, the Court believes the sum to be a moderate allowance and therefore is not disposed to reduce it.

Claim of J. Cookman Boyd, Jr., for $3,500, for legal services. This petition is based upon services rendered by Mr. Boyd in representing Property Management, Inc., which, for a considerable period of time and in various capacities, has represented holders of certificates of the debtor company. In addition, Mr. Boyd has appeared in the present proceedings on behalf of individual bond holders and at the request of the trustee, has appeared on behalf of the group of certificate holders of the debtor company who dissented or did not assent to the 1933 plan of the Company and who thereby acquired certain rights differing from those of certificate holders generally.

Property Management, Inc., originally filed a claim for compensation to itself in the amount of $12,500, plus some small additional out of pocket expenses. However, in the course of the hearing, this

claim was withdrawn, Mr. Boyd, its counsel, accepting the view entertained by the Court that certain transactions, though relatively small, by Property Management, Inc., by which it took title to certain claims against the debtor company in order to protect its customers, certificate holders, through maintaining a market at fair and reasonable prices for the certificates, nevertheless appeared prima facie to preclude Property Management, Inc., from the allowance of any compensation in this proceeding upon a literal interpretation of the provisions of Section 249 of the Act. This provides that "No compensation or reimbursement shall be allowed to any committee or attorney, or other person acting in the proceedings in a representative or fiduciary capacity, who at any time after assuming to act in such capacity has purchased or sold such claims or stock, or by whom or for whose account such claims or stock have, without the prior consent or subsequent approval of the judge, been otherwise acquired or transferred." 11 U. S.C.A. § 649. However, Mr. Boyd's position as attorney for Property Management, Inc., is entirely clear of any conflict with this statutory restriction.

Mr. Boyd's claim is predicated upon approximately 200 hours of legal work, all performed subsequent to the commencement of these Court proceedings. The trustee asserts that Mr. Boyd's work has been beneficial in the administration of the debtor company's estate, including the ultimate ironing out, so to speak, of certain widely contested provisions in the trustee's plan as originally proposed. However, the trustee recommended a reduction in the amount claimed.

■ After careful consideration of Mr. Boyd's claim for services and the relative value of same, the Court concludes that the requested sum of $3,500 is reasonable and proper and will therefore be allowed.

■ Claim of Jacob S. New and H. Paul Rome, for $5,000, for legal services. These attorneys, also members of the Baltimore Bar, claim this allowance for services performed in representing a group of holders of certificates of the debtor company who, in April, 1939, associated themselves as an Independent Certificate Holders Committee. While part of the services in question were performed prior to these proceedings, it appears that by far the greater part were performed later. While by no means proponents and supporters of all features of the plan of reorganization as ultimately confirmed, Messrs. New and Rome, in representing what may properly be called the minority interest, did contribute materially towards the ultimate success of the plan. In this the trustee agrees and the Court believes that the amount requested, namely, $5,000, is reasonable and appropriate compensation and therefore will be allowed.

Claim of Carlyle Barton and George S. Yost, for $2,500, for legal services. This petition is based upon services rendered since the commencement of these proceedings to the Title Guarantee & Trust Company, one of the creditors herein and a holder of a very substantial amount in par value in claims against the debtor company, i. e., approximately $260,000 par value of its first mortgage certificates; more than $1,000,000 par value of its second mortgage certificates and the only holders of such certificates; and also, small amounts of third mortgage certificates and unsecured claims.

■ It appears that the services rendered by these attorneys have been comparable in character, in so far as their beneficial effect upon the administration of the estate is concerned although considerably less in extent, to the services heretofore considered rendered by other attorney claimants herein such as Messrs. Beeuwkes, Skeen & Oppenheimer, J. Cookman Boyd, Jr., and New and Rome. Messrs. Barton and Yost have been paid by their client, the Title Guarantee & Trust Company, $1,500. They propose that if their present petition is granted, this payment be returned to their client. Instead, we believe that they should be allowed in the present proceedings the sum of $1,000 on the assumption that they are entitled to retain the $1,500 already paid by their client.

■ Claim of Harry E. Karr, for $2,500, for legal services. Mr. Karr files his petition also as counsel for the Title Guarantee & Trust Company and for its affiliate, the Title Mortgage & Management Company, with respect to properties held by the debtor company and one of its subsidiaries, the Saratoga Building & Land Company, for the purpose of determining whether the Title Guarantee & Trust Company and the Title Mortgage & Management Company who were holders of

second mortgages on these properties, were entitled to take them over or to be allowed to foreclose their second mortgages.

Unquestionably Mr. Karr has spent a great deal of time and effort in this representation. He has filed and exhaustively argues for numerous petitions in connection with this representation. However, in its last analysis, it seems equally clear that without torturing the language of the Act, it cannot be said that these services have "contributed to the plan confirmed", or have been "beneficial in the administration of the estate." Quite to the contrary, Mr. Karr's position has been one of opposition to one of the basic features of the plan as confirmed, namely, that the junior position of second mortgagees could not be reversed in these proceedings.

Mr. Karr has received as a retainer from his clients for the services here involved, the sum of $1,000 and asserts that he has not yet rendered any further bill to his clients. He further sets forth in his petition that he "is uncertain as to whether he is entitled to a fee from the assets of the Debtor and therefore files this petition in order to submit the question to this Honorable Court."

For the reasons given, we conclude that Mr. Karr cannot be compensated in these proceedings but must look to his clients directly for further compensation for his untiring efforts, even though not fruitful, in this proceeding on their behalf.

Claim of Knapp, Tucker, Thomas & Gray, for $25,000, for legal services. This claim is filed for services rendered as counsel to the debtor company and its subsidiaries, by far the larger proportion of which services were rendered prior to the institution of these proceedings.

What was done by these attorneys falls into two general classes: (1) Services rendered prior to the institution of these proceedings but which these attorneys assert were of material assistance in connection with the plan which was ultimately confirmed; and (2) services rendered since the institution of these proceedings.

With respect to the services rendered prior to these proceedings, these attorneys would have us go back as far as the latter part of 1935 and compensation is sought from that time up to the present. It appears that as far back as 1932, these attorneys did extensive legal work for the Mortgage Guarantee Company. Certainly with respect to both the Readjustment Plan of 1933 and the Realization Plan of 1937 their work was substantial. In connection with the latter, even though like the former plan it failed of final adoption, these attorneys were largely instrumental in connection with the formation of the Certificate Holders Committee and with obtaining from the Reconstruction Finance Corporation its conditional promise to lend $7,500,000 in connection with the Realization Plan, all of which finally resulted in 84% of the certificate holders depositing under this plan. These, in broad outline, are the things upon which these attorneys labored prior to the institution of the proceedings in this Court and for which they claim they are entitled to reimbursement in these proceedings; that is to say, for services for approximately four years antedating these proceedings. During this time they received $5,000 a year (except in 1939) from the Mortgage Guarantee Company which, however, was stated to have been a payment on account and not embracing or intended to embrace full compensation for the services just outlined, all of which these attorneys claim directly related to and contributed to the final adoption of the plan in this Court. In short, it is contended that these services "contributed to the plan confirmed," and "were beneficial in the administration of the estate," within the meaning of Section 243 of the Bankruptcy Act. It has been testified by Mr. Thomas, the member of the firm who did the major part of the work for the Mortgage Guarantee Company, that no less than 150 working days were spent by him and his associates in professional work for the Company in 1937, and that 240 and 170 days were likewise spent in 1938 and 1939, respectively.

As already indicated, there is no doubt that a reasonably liberal interpretation must be given to Section 243 and that by its terms, compensation is not necessarily limited to services rendered after the institution of proceedings under Chapter X. However, the antecedent services must have a real and not a mere theoretical relation to the reorganization as such. In the present case, we feel that what these attorneys did prior to the year 1939 bore a relation and produced a benefit to the administration of the debtor company's affairs which do not warrant the allowance of compensation for them in these proceedings, in view of what they have already received. For example, the

major portion of these prior services related to a plan which not only failed of accomplishment but was based upon an entirely different principle from the plan ultimately confirmed by this Court, namely, it contemplated a large loan, whereas the present plan is one of straight liquidation. The two plans are not closely related to each other except on the broad principle that of course the underlying object of both was to pay the debts of the insolvent company. True, the fact that 84% of the company's creditors had deposited their securities under the earlier plan gave the trustee under the reorganization proceedings a head-start, so to speak, with respect to reaching these security holders for the purpose of ascertaining their views with respect to the trustee's plan. Also, it resulted in very definite economies. However, as already indicated, these things were not the result of Mr. Thomas' legal services nearly as much as they were the result of the activities of the Certificate Holders Committee, its counsel and others whom it employed to contact the certificate holders, and who have sought and have been allowed compensation in these proceedings.

There remains then to be considered what is reasonable and proper compensation for Messrs. Knapp, Tucker, Thomas & Gray for their professional services rendered in 1939, 1940 and 1941, that is, just prior to and since the institution of these proceedings. They were paid nothing by the debtor company in 1939 and of course, since the institution of these proceedings, nothing has been paid them. They assert that in 1939 they spent 170 working days on matters affecting the reorganization. There is no doubt but what their work was extensive shortly prior to September, 1939, in connection with representing the company in actual and threatened foreclosure suits and in preparing and filing the papers under Chapter X. It was inevitable, however, that in 1940 and during the current year, the demands upon these attorneys for legal services as counsel to the debtor should very materially decline. This is borne out by their statements that in 1940 they only spent some 40 working days and in 1941, 10 working days on the debtor company's affairs.

■ On the aforegoing analysis of the services rendered by these attorneys during 1939, 1940 and 1941, we conclude that total fair compensation for same is

$7,000. Accordingly, this amount will be allowed them. In making this very substantial reduction in the claim as submitted, we are not to be understood as saying that the services of these attorneys for the years 1935, 1936, 1937 and 1938 were not worth more than the $5,000 annual payment made by the Company. Our conclusion merely is that whatever the services performed during these years may have been worth, compensation cannot be paid out of the Company's assets in this reorganization proceeding. We further recognize the fact that what we have said is small consolation to these attorneys because there is no other method by which they may now be compensated. But this Court is powerless to remedy such a situation.

Claim of H. Nathaniel Blaustein, for $3,000, for legal services. This claim is based upon services rendered by Mr. Blaustein as special attorney to the Certificate Holders Committee during the period from December 1, 1938, to September 23, 1939. It appears that Mr. Blaustein was employed by this Committee commencing in October, 1937, at the rate of $300 a month, to act as the Committee's special representative in approaching and obtaining acceptances from certificate holders under the direct supervision and direction of Mr Blanchard Randall, Jr., then president of the Mortgage Guarantee Company. Unfortunately, this employment was not evidenced by any written agreement of the parties. However, Mr. Blaustein did enter upon his duties, working as required by Mr. Randall in collaboration with counsel for the company, counsel for the Committee and with Stein Bros. & Boyce, bankers, acting as deposit agents for the Committee. Mr. Blaustein claims that his labors resulted in securing the deposit or certificates aggregating in excess of $1,000,000 face value; that this required him to interview many attorneys representing certificate holders who, at his instance, recommended to their clients the deposit of their certificates with the Committee when, in many instances, they had previously refused to do so and that he thereby avoided many law suits against the company and contributed towards the completion of the ultimate reorganization plan.

The theory upon which Mr. Blaustein now asks that his monthly compensation be doubled is that his salary of $300 a month is based upon an understanding

that he would only give half time services at that price and that if full time services were required, he would receive $600 per month. Commencing December 1, 1938, he asserts that he gave his full time to the interests of the Company in the manner above described.

The members of the Committee and Mr. Randall admit the employment of Mr. Blaustein at the rate of $300 a month but deny that there was any understanding, expressed or implied, that he would be entitled to receive more than that amount should his labors for the company be increased. It would appear that Mr. Blaustein's services were largely akin to those of Mr. Poe in his capacity as secretary to the Committee and of Stein Bros. & Boyce, as its deposit agent. Mr. Randall has stated that Mr. Blaustein did not personally obtain for deposit more than $400,000 face value of certificates. Mr. Randall has further stated that inasmuch as the 1937 reorganization plan contemplated that the Company should pay all expenses, he acted on behalf of the Committee in employing Mr. Blaustein and having the company pay him; that the understanding was that Mr. Blaustein should give a portion of his time, having the remainder free for personal practice; that he should be paid at the rate of $300 a month and no more, and that on this basis he has received the sum of $7,400 from the company; that at no time was any time check kept on the days or hours that Mr. Blaustein worked, he being permitted at all times to adopt his own schedule; that he was also reimbursed for his expenses in traveling in connection with the company's affairs; that he was maintained on the payroll for approximately six months (pending release by the Securities & Exchange Commission of the company prospectus) when it was impossible for him to accomplish anything along the lines for which he had been employed; and that he received by way of advances, pay for approximately six weeks after the institution of these present proceedings had, of necessity, brought his services to a close.

We conclude from the aforegoing that Mr. Blaustein is not entitled to be further compensated in these proceedings. The total sum already received appears to be very fair compensation for the services which he performed when compared with the similar services of Mr.

Poe and others, compensation to whom has previously been fixed in this opinion.

To summarize, allowances in the aggregate sum of $194,689.81 have been requested. The Court has reduced this total to $161,600, for the reasons herein stated in each particular case where a reduction or denial of any compensation is deemed to be necessary. Even with this reduction, the aggregate sum is very large and may, in fact, appear to some to be exorbitant, especially to the unfortunate holders of the mortgage certificates of the debtor company who, for a number of years, have received relatively little or nothing on their investments and whose ultimate return is problematical and can never be, except in a relatively small proportion of cases, 100%. But every individual or corporation that is being compensated as a result of this opinion has contributed in some degree directly to improving the status of every creditor of the Company. That is to say, they have all assisted in bringing about the present reorganization without which all creditors would be in a far worse position. This being true, justice demands that moderate compensation be awarded to every one who has had a part in this accomplishment. The Court has scrutinized with the greatest care the character and extent of the services in each individual case where compensation has been claimed and to the best of its ability has endeavored to fix the proper amount of compensation for the services in each instance, entirely apart from the amount that has been requested. That the Court has agreed to a very large extent with the amounts that have been claimed may prima facie appear to refute this latter statement. On the other hand, the Court believes it is fairer to say that the individuals and corporations who have struggled long and hard in this very involved proceeding have, in filing their claims for a reward for their labors, been highly conscious of the limitations which of necessity affect the allowances of any compensation to them and have been sincere in their efforts to ask for no more than they have honestly felt they are entitled to receive under the circumstances.

The Securities and Exchange Commission occupying an anomalous position under the Act, and acting through authority presumably thought to be implied from the provisions of the Act, in a role akin to

that of peoples' counsel, has seen fit through its counsel, strenuously to oppose in toto several of the requested allowances, as for example, the allowance to Stein Bros. & Boyce, and several others in part, as for example, the Commission has urged the reduction of the fee allowed to Semmes, Bowen & Semmes, to $10,000.

We do not, however, deem it necessary to consider in detail these objections in view of the full opinion which has been rendered. Suffice it to say that the Court has given very careful consideration in each instance to the position taken by the Securities & Exchange Commission but, for the reasons already given, the Court is not disposed to adopt the Commission's views.

An order will be signed authorizing payment of compensation and reimbursement for expenses as herein specified. Since the free assets of the debtor company are not now sufficient to cover all of these disbursements, it follows that payment in installments will have to be resorted to. This will be covered in detail by an appropriate order.